# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MONZITA R. GRIFFIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 11 C 5091** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Monzita R. Griffin ("Griffin" or "plaintiff") requests judicial review of the final decision denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSIB") under Title II of the Social Security Act.[1] Plaintiff has filed motion for summary judgment seeking a judgment reversing or remanding the final decision. For the reasons set forth below, the Court grants in part and denies in part plaintiff's motion [dkt. 16].

### I. PROCEDURAL HISTORY

On August 15, 2007, plaintiff filed applications for DIB and SSIB based on an alleged disability beginning on September 13, 2006.[2] Plaintiff alleged that the pain caused by a diagnosis of fibromyalgia prohibited her from maintaining the types of employment she had previously held.[3] On November 30, 2007, the Social Security Administration ("SSA") denied her claim.[4] On January

---

[1] 42 U.S.C. §405(g).
[2] R. at 119.
[3] R. at 164.
[4] R. at 78.

8, 2008, plaintiff filed a request for reconsideration.[5] On February 8, 2008, the SSA denied the request for reconsideration.[6] On March 19, 2008, plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").[7] On February 12, 2009, after the SSA granted the request, ALJ Joel G. Fina presided over the hearing.[8] On March 2, 2009 ALJ Fina issued a written decision finding no disability because plaintiff could still perform the duties of her past employment as a cashier.[9] On April 13, 2009, consequently, plaintiff filed a request for review of the ALJ's decision.[10] On December 9, 2010 and again on May 27, 2011, the SSA denied the request.[11] Therefore, the ALJ's decision became the final decision of the Commissioner.[12] On September 26, 2011, plaintiff filed this action.

## II. STATEMENT OF FACTS

This section supplies a brief overview of plaintiff's background, along with the chain of events leading up to her application for disability. All of the facts can be found in the medical record, which the ALJ reviewed at the hearing and considered when issuing his written decision.

### A. General History

Plaintiff was born on April 20, 1959, making her 49 at the time of her hearing before the ALJ.[13] At the time of the hearing, plaintiff was married with two minor stepdaughters and a minor

---

[5] R. at 88.
[6] R. at 84.
[7] R. at 90.
[8] R. at 117.
[9] R. at 20-31.
[10] R. at 18-19.
[11] R. at 11, 1.
[12] R. at 11.
[13] R. at 35.

step-granddaughter.[14] She graduated high school and had last worked in August 2006.[15] From 1988 until 2006, plaintiff held seven different positions of employment as a cashier and stocker in shoe stores, a security officer, a dispatcher, and a school bus driver.[16]

From 1990 until 2006, Bruce C. Malm, M.D. served as plaintiff's physician.[17] But this long treatment relationship is only relevant to this case with respect to her high blood pressure condition.[18] Dr. Malm's prescribed Fosinopril and Norvasc to treat the high blood pressure.[19]

Beginning in 2002, plaintiff began seeing Majid Serushan, M.D. with complaints of arthritis.[20] In 2003, plaintiff was diagnosed with fibromyalgia.[21] From 2005 to 2007, Dr. Serushan noted plaintiff's repeated complaints of pain and tenderness.[22] On April 25, 2007, Dr. Serushan, then her sole treating physician, noted that Griffin had many tender points in her neck and shoulder regions.[23] Dr. Serushan prescribed a variety of medications for Griffin's fibromyalgia, including Alprazolam, Hydrocodone with APAP, and Requit.[24]

Plaintiff also asserts that in high school, or approximately thirty-five years ago, she was diagnosed with a seizure disorder.[25] She alleges that she had seizures as often as once a week characterized by drooling and tongue biting, among other symptoms.[26] In September 2006, Amarjit S. Bhasin, M.D., prescribed medication to treat plaintiff's seizure disorder.[27]

---

[14] R. at 38-39.
[15] R. at 39-40.
[16] R. at 157.
[17] R. at 152.
[18] R. at 154.
[19] *Id.*
[20] R. at 153.
[21] R. at 324.
[22] R. at 265-74.
[23] R. at 268.
[24] R. at 154.
[25] R. at 40.
[26] *Id.*
[27] R. at 151.

Additionally, plaintiff asserts that she has suffered from depression since high school.[28] She reports that she contemplated suicide several times between the ages of nineteen and twenty, and last attempted to take her own life in 1997.[29] From October 2006 to March 2007, plaintiff underwent psychological counseling for her depression.[30]

Lastly, plaintiff has sought medical treatment for several issues not pertinent to this case. For instance, in 2007, plaintiff visited Ingalls Memorial Hospital with complaints of a stomach problem.[31] Similarly, in 2007 plaintiff went to St. Mark's Professional Medical Center to seek additional treatment for arthritis.[32] Also in 2007, plaintiff visited Oak Forest Hospital of Cook County because of sinus problems.[33]

**B. Application**

As part of plaintiff's application for DIB, she provided a variety of documents pertaining to her medical history and daily activities. On her undated Disability Report, plaintiff alleged that she had been unable to work because of her medical conditions since September 13, 2006.[34] She indicated that she suffered from constant pain and that she had often had seizures. These limitations, she claimed, limited her ability to work.[35]

In her Activities of Daily Living Questionnaire for Physical Impairments, plaintiff alleged that her fibromyalgia caused swelling, chronic fatigue, cramping, and burning sensations.[36] In this

---

[28] R. at 285.
[29] R. at 286.
[30] R. at 151.
[31] *Id.*
[32] R. at 152.
[33] R. at 153.
[34] R. at 148.
[35] R. at 148.
[36] R. at 165.

questionnaire, Griffin also asserted that the pain was focused in her back, right hand, arm, shoulder, and neck.[37] According to plaintiff, the pain limited her ability to cook, shop, and do other household chores, and also to bend or stoop.[38] In particular, plaintiff claimed hand pain limited her ability to manipulate objects such as silverware; however, she did teach herself to use an electric can opener with her non-dominant left hand.[39] When plaintiff filled out the field office's Disability Report, a field officer documented that plaintiff had difficulty signing her name because of pain in her right wrist.[40] Nonetheless, plaintiff still watched and cared for her young granddaughter on a somewhat regular basis.[41]

In another portion of the DIB application, a signed statement made in a daily activities telephone report, plaintiff's mother, Montez Davis, explained that her daughter drove herself to get around.[42] Davis also stated that plaintiff kept her home clean, but needed help from her stepdaughters for some activities such as cooking.[43] Davis described plaintiff's personal appearance as very clean and neat.[44]

## C. Medical History for Purposes of Disability Application

Though Griffin had extensive medical history prior to filing for DIB, both her treating doctor and state agency doctors reviewed her case and completed reports for purposes of her application. Her treating physician, Dr. Serushan, provided a report and prior medical notes assessing plaintiff's alleged disabilities.[45] One state agency doctor examined plaintiff while another reviewed her medical

---

[37] R. at 166.
[38] R. at 167.
[39] R. at 165.
[40] R. at 145.
[41] R. at 170.
[42] R. at 174.
[43] *Id.*
[44] *Id.*
[45] R. at 323.

file.[46] A state agency psychologist also examined plaintiff while another state specialist reviewed her file to assess her allegations of psychological disability.[47] Several months later, a fifth state agency doctor reviewed plaintiff's file and the reports previously submitted by the four other state agency doctors.[48]

In his Fibromyalgia Residual Functional Capacity Questionnaire dated June 18, 2008, treating physician Dr. Serushan cited three Magnetic Resonance Imaging ("MRI") tests as laboratory tests that demonstrated his patient's medical impairments.[49] Dr. Serushan did not, however, explain the results of those tests or how they were relevant.[50] At the end of his report, Dr. Serushan concluded that plaintiff was incapable of even low-stress jobs because she "cannot perform duties."[51] He recommended that she sit for no more than twenty minutes at a time and stand for no more than fifteen.[52] Similarly, he concluded that plaintiff should both sit and stand or walk for less than two hours out of every eight-hour workday.[53] Lastly, Dr. Serushan reported that plaintiff could never lift any amount of weight in a competitive work situation, could stoop for only 5% of a workday and crouch for 0%, and could not repetitively reach, handle, or finger objects without significant limitations.[54]

On October 10, 2007, Liana D. Palacci, D.O., conducted an Internal Medicine Consultative Examination on plaintiff on behalf of the SSA.[55] Dr. Palacci reported that plaintiff denied any tender

---

[46] R. at 289, 293.
[47] R. at 285, 301.
[48] R. at 320.
[49] R. at 323.
[50] Id.
[51] R. at 325.
[52] Id.
[53] Id.
[54] Id.
[55] R. at 289, 292.

trigger points relating to her fibromyalgia.[56] Dr. Palacci also reported that plaintiff's range of motion was normal in her cervical spine, lumbar spine, shoulders, elbows, wrists, fingers, knees, ankles, and hips.[57] Plaintiff's bilateral grip strength was also a five on a five-point scale.[58] Her fine and gross motion was intact, and she was able to bear weight, squat, and walk without an assistive device.[59] In conclusion Dr. Palacci asserted that plaintiff's fibromyalgia was well controlled and that she was "able to perform all activities of daily living."[60]

Dr. Palacci also noted plaintiff's history of seizures.[61] In the past, plaintiff had approximately one seizure per week, but at the time of the consultation she had not had one for over a year.[62] Dr. Palacci also documented plaintiff's hypertension, and noted that it was poorly controlled.[63]

On November 5, 2007, state agency doctor Delano Zimmerman, M.D., conducted a Physical Residual Function Capacity Assessment of plaintiff's file.[64] Dr. Zimmerman concluded that plaintiff could occasionally lift or carry up to fifty pounds, and frequently carry or lift up to twenty-five pounds.[65] Moreover, plaintiff could push or pull without limits other than the lifting and carrying limits just described.[66] Also, plaintiff could both sit and stand or walk for about six hours in an eight-hour workday.[67] Finally, Dr. Zimmerman found no limitations for plaintiff in posture, manipulation, vision, or communication.[68]

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] R. at 292, 290.
[61] R. at 289.
[62] *Id.*
[63] R. at 292.
[64] R. at 293.
[65] R. at 294.
[66] *Id.*
[67] *Id.*
[68] R. at 295-97.

On October 10, 2007, plaintiff also had a psychological examination performed on behalf of the SSA by clinical psychologist Michael W. Stempniak, Ph.D., to which she traveled by public transportation.[69] Dr. Stempniak noted plaintiff's physical complaints, and also documented her depression dating back to high school.[70] Plaintiff described her mood as "funky" to Dr. Stempniak, who recorded her affect as "somewhat depressed."[71] Plaintiff attempted suicide multiple times in the past, but no attempts occurred within the prior ten years.[72]

Dr. Stempniak sampled plaintiff's memory at the low-average range, as she could repeat up to five digits forward and three digits backward.[73] Plaintiff struggled to continuously subtract seven from 100.[74] In conclusion, the doctor diagnosed plaintiff with recurrent but mild Major Depressive Disorder.[75]

On November 26, 2007, plaintiff also underwent a psychiatric review conducted by Joseph Mehr, Ph.D., who reviewed plaintiff's file for the SSA.[76] Dr. Mehr found that plaintiff's mental impairments were not severe.[77] He listed plaintiff's limitations as mild with respect to activities of daily living, maintenance of social functioning, and maintenance of concentration, persistence, or pace.[78] He also found no episodes of extended decompensation.[79]

Finally, on February 5, 2008, the SSA submitted plaintiff's file to Terry Travis, M.D., for

---

[69] R. at 285.
[70] *Id.*
[71] R. at 286.
[72] *Id.*
[73] R. at 287.
[74] *Id.*
[75] *Id.*
[76] R. at 301.
[77] *Id.*
[78] R. at 311.
[79] *Id.*

reconsideration as part of a request for medical advice.[80] Dr. Travis noted that plaintiff could drive, clean, cook, and perform gross and fine manipulation.[81] In conclusion, Dr. Travis affirmed the other state agency doctors' prior findings relating to plaintiff's physical and mental limitations.[82]

## C. The Hearing

Plaintiff's hearing before the ALJ took place on February 12, 2009 in Chicago, Illinois.[83] Plaintiff appeared in person and was represented by Attorney Andrew A. Burone.[84] A vocational expert ("VE"), James Green, also testified.[85] At the hearing, the ALJ asked plaintiff a series of questions. He began by asking for background and demographic information, before moving into employment history.[86] The ALJ then had plaintiff describe her ability to perform daily activities such as driving, cooking, and washing dishes.[87] Plaintiff also explained that her hobbies included sewing and making baskets and jewelry.[88]

The ALJ then posed a series of questions relating to the type, location, duration, and severity of Griffin's pain.[89] Plaintiff explained that her pain shifts to different parts of her body at different times, but that at that particular point in time her pain rated as a seven on a one-to-ten scale.[90] The ALJ then posed extensive questions relating to plaintiff's care of her baby granddaughter.[91] Plaintiff acknowledged that she was able to feed and bathe the child, as well as change her diaper.[92] Lastly,

---

[80] R. at 320.
[81] R. at 322.
[82] *Id.*
[83] R. at 34.
[84] *Id.*
[85] *Id.*
[86] R. at 39-40.
[87] R. at 44.
[88] R. at 45.
[89] R. at 47.
[90] *Id.*
[91] R. at 48-50.
[92] *Id.*

during the final portion of her testimony, plaintiff alleged that she became depressed about twice a month, and that she consequently would go to her room to stay by herself during those times.[93]

Following plaintiff's testimony, the ALJ questioned the VE.[94] The VE defined all of plaintiff's past work as either unskilled or semi-skilled and light or medium in terms of exertion.[95] The ALJ then presented the VE with a hypothetical involving an individual of plaintiff's age, education, work experience and skill set, with the following limitations: can occasionally lift twenty pounds; can frequently lift or carry ten pounds in light work; can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; can occasionally balance, stop, crouch, or kneel; can never crawl; can occasionally reach overhead bilaterally; can frequently grossly or finely manipulate objects.[96] The VE found that such an individual could perform plaintiff's past jobs as a cashier, security guard, and dispatcher.[97] The ALJ then posed a second hypothetical with the same limitations of the first but also restricting the work to simple, routine, and repetitive tasks.[98] The VE stated that such an individual could perform the duties of a cashier.[99] The ALJ posed three further hypotheticals to the VE before concluding the hearing.[100]

---

[93] R. at 51.
[94] R. at 66.
[95] R. at 69.
[96] *Id.*
[97] *Id.*
[98] R. at 70.
[99] *Id.*
[100] R. at 71.

### D.  The ALJ's Decision

ALJ Fina determined that plaintiff was not disabled and therefore not eligible to receive benefits.[101] The ALJ first found that plaintiff had acquired sufficient quarters of insurance coverage to remain insured until December 30, 2010, and thus satisfied the requirements of sections 216(i) and 223 of the Social Security Act.[102] The ALJ then examined the case using the five-step process put forth by 20 C.F.R. 404.1520(a) in order to determine if plaintiff was disabled.[103]

At step one, the ALJ had to determine if plaintiff was engaged in substantial gainful activity, which is defined as work involving significant physical or mental activities that is usually done for pay or profit.[104] ALJ Fina found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability in September 2006.[105] Consequently, the analysis proceeded to step two.

The second step required the ALJ to decide whether plaintiff's combination of impairments is "severe" or significantly limits plaintiff's ability to perform basic work activities.[106] The ALJ concluded that plaintiff's impairments were in fact severe, although there is no reasoning to support that decision except for a brief summary of plaintiff's conditions.[107] Because the judge found the impairments to be severe, the analysis proceeded to step three.

For this step, ALJ Fina examined whether plaintiff's combination of impairments meets or equals the criteria of an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found

---

[101] R. at 31.
[102] 42 U.S.C. §§ 416(i), 423.
[103] R. at 24.
[104] 20 C.F.R. 404.1520(b), 20 C.F.R. 404.1572(a), 20 C.F.R. 404.1572(b).
[105] R. at 25.
[106] 20 CFR 404.1520(c).
[107] R. at 25-26.

that the impairments did not meet or equal the criteria of listing 12.04.[108] In the "paragraph B" criteria of this listing, the impairments must cause marked difficulties in two of the following: maintaining social functioning, maintaining concentration, persistence, or pace, or repeated and extended episodes of decompensation.[109] The ALJ concluded that plaintiff's impairments did not satisfy two of those elements.[110] Similarly, the ALJ succinctly concluded that the impairments also did not satisfy the "paragraph C" criteria.[111] Had Griffin's impairments met or equaled these criteria, the ALJ would have classified her as disabled. Conversely, because he found otherwise, the analysis continued.

Before step four, the ALJ had to determine plaintiff's residual functional capacity ("RFC") per 20 C.F.R. 404.1520(e). An RFC is an individual's ability to regularly complete physical and mental work activities despite medical impairments.[112] The ALJ must incorporate all impairments, severe or minor, into his or her analysis.[113] The ALJ concluded that plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b). Such work is characterized by: never crawling; never climbing ladders, ropes, or scaffolds; occasionally reaching overhead bilaterally; frequently handling and fingering objects; and avoiding concentrated exposure to unprotected heights. The ALJ also limited plaintiff's work to simple, routine, and repetitive tasks.[114]

To come to this conclusion, the ALJ first found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."[115] However, he then held

---

[108] R. at 26.
[109] Id.
[110] Id.
[111] Id.
[112] R. at 24.
[113] Id.
[114] R. at 27.
[115] R. at 28.

that plaintiff's statements were not credible "to the extent that they are inconsistent with the above [RFC] assessment."[116] The ALJ justified this conclusion by examining each of the plaintiff's four alleged disabilities in turn.

He first reasoned that medication had been effectively controlling plaintiff's seizures.[117] Second, he similarly concluded that her fibromyalgia was well controlled by citing a variety of factors from her medical examinations and reviews, such as her normal range of motion.[118] Third, the ALJ briefly described that nothing in the medical records indicated any disabilities were caused by plaintiff's high blood pressure or hypertension.[119]

Fourth, the ALJ undertook a detailed analysis of plaintiff's mental health history.[120] As part of that analysis, the ALJ determined that plaintiff had only mild limitations in daily activities, as evidenced by her capacity for personal grooming, driving, cleaning, cooking, and caring for her granddaughter.[121] The ALJ similarly found only mild limitations in plaintiff's social functioning because she did not exhibit signs of an inability to interact appropriately with others.[122] Lastly, the ALJ, in part citing the plaintiff's results on the memory and addition tests from her mental evaluation, stated that plaintiff had moderate limitations in concentration, persistence, or pace.[123] Because plaintiff's social functioning and activities of daily living were limited only mildly, and her limitations in concentration, persistence, or pace were moderate, the ALJ concluded that plaintiff's depression did not render her completely disabled.[124]

---

[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] R. at 28-29.
[121] R. at 29.
[122] *Id.*
[123] *Id.*
[124] R at 29-30.

In weighing the doctors' opinion evidence, the ALJ granted "some weight" to the reports of the state agency medical consultants, while not granting "any significant weight" to that of her treating physician Dr. Serushan.[125] Dr. Serushan, the ALJ explained, relied too heavily on the plaintiff's subjective reports, and also did not thoroughly explain the evidence he based his opinion on.[126] Likewise, as stated above, the ALJ concluded that Griffin's assertions of symptoms were not credible because they were inconsistent with various elements of the record, such as her daily activities.[127]

Once the ALJ defined the RFC, he then had to consider whether Griffin had the RFC to perform the duties of her past employment.[128] Based on the VE's testimony, the ALJ held that Griffin could complete the duties required of a cashier, one of her former jobs.[129] Thus, the ALJ ruled that plaintiff had not been disabled since 2006 and, therefore, denied her appeal.[130]

### III. STANDARD OF REVIEW

The Court undertakes a de novo review of the ALJ's conclusions of law, but the review of the ALJ's factual determinations is more deferential.[131] So long as the evidence is substantial, or sufficient for a reasonable person to accept a justification for the decision, the Court will uphold the ALJ's decision.[132] But this deference is not unlimited though, and the Court must remand a case if there is insufficient evidentiary support.[133]

### IV. ANALYSIS

---

[125] R. at 30.
[126] *Id.*
[127] R. at 28, 30.
[128] 20 C.F.R. 404.1520(f).
[129] R at 31.
[130] *Id.*
[131] *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).
[132] 42 U.S.C. § 405(g); *Overman* 546 F.3d at 462.
[133] *Overman* 456 F.3d at 462.

Plaintiff argues that the ALJ's decision must be reversed or remanded because: (1) The ALJ failed to adequately include limitations in concentration, persistence, or pace in his hypotheticals posed to the VE; (2) The ALJ improperly weighed Dr. Serushan's opinion in violation of SSR 96-2p; (3) The ALJ failed to properly analyze plaintiff's complaints when determining her credibility; (4) The ALJ's RFC finding failed to properly consider evidence of plaintiff's hand limitations and was otherwise unsupported. The Court will consider each of these arguments in turn.

## A.   The ALJ's Hypotheticals Concerning Plaintiff's Concentration, Persistence or Pace

First, plaintiff insists that the ALJ, after concluding that plaintiff had mild limitations in daily activities and social functioning and moderate difficulties in concentration, persistence, and pace, erred in failing to include these limitations in his hypotheticals posed to the VE.[134] Plaintiff submits that, instead, the ALJ inadequately presented a hypothetical, the second of five, to the VE in which an individual was limited in part to simple, routine, and repetitive tasks.[135] (And we only know that this language intended to relate to plaintiff's mental impairments because the ALJ distinguished an earlier hypothetical as that "which did not have any mental limitations").[136]

In *O'Connor-Spinner v. Astrue*, the Seventh Circuit has held that "[i]n most cases . . . employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."[137] But as the Commissioner argues, there are exceptions to the rule and a faulty hypothetical is not always grounds for remand (although the Commissioner does not explain how these exceptions apply to this case). The court in *O'Connor Spinner* described a first exception in

---

[134] R. at 29.
[135] R. at 70.
[136] R. at 70.
[137] *O'Connor-Spinner*, 627 F.3d 614, 619 (7th Cir. 2010).

which a VE is sometimes assumed to be familiar with a claimant's alleged disabilities even when there are holes in the hypothetical.[138] This assumption only applies, however, when "the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations."[139] Here, the record indicates that the VE both reviewed the file and heard testimony relating to plaintiff's limitations.[140]

Unfortunately, that does not end the inquiry for the purposes of this case. The Seventh Circuit further explained in *O'Connor-Spinner* that such an exception does not apply when "the ALJ poses a series of increasingly restrictive hypotheticals to the VE."[141] In these types of cases, the court "infer[s] that the VE's attention is focused on the hypotheticals and not on the record."[142] Here, the ALJ did just that when he posed a series of five increasingly restrictive hypotheticals.

We must, therefore, look to the next possible exception. The *O'Connor-Spinner* court further explained that a hypothetical may still be appropriate even when it does not include the phrase "concentration, persistence, and pace" if "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform."[143] For example, courts have let stand hypotheticals that restrict plaintiffs with panic disorder limitations to low-stress work.[144] Or an exception was made allowing a hypothetical in which the ALJ did not refer to the limitations of concentration, persistence, and pace, but did refer to the underlying conditions of a chronic pain disorder and a somatoform disorder.[145] But even if we

---

[138] *Id.* at 619
[139] *Id.*
[140] R. at 67.
[141] *O'Connor-Spinner*, 627 F.3d at 619.
[142] *Id.*
[143] *Id.*
[144] *Id.*
[145] *Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009).

apply that reasoning here, the ALJ in this case did not refer to plaintiff's underlying limitations or conditions in any way in his hypotheticals.

The ALJ's hypothetical must ensure that "the VE eliminate[d] positions that would pose significant barriers to someone with the applicant's depression-related problems in concentration, persistence, and pace."[146] Because, based on this Seventh Circuit precedent, the ALJ's hypothetical did not, we must remand.

Plaintiff also puts forth a related argument that the ALJ's RFC determination was flawed because he only included plaintiff's mental limitations by restricting her to simple, routine, and repetitive tasks. Because Seventh Circuit case law makes it clear that remand is needed with respect to the ALJ's hypotheticals, we only briefly address the RFC argument. The Seventh Circuit has repeatedly held that an ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion."[147] Here, the ALJ properly described all of the evidence that he used to determine plaintiff's RFC, particularly with regard to plaintiff's mental limitations. Yet the ALJ did not explain how he made the jump from moderate difficulties in concentration, persistence, and pace to a restriction of simple, routine, and repetitive tasks. Therefore, upon remand the ALJ should more fully explain this conclusion.

**B. Weighing of Dr. Serushan's Opinion**

Plaintiff also argues that the ALJ failed to satisfactorily discuss the opinion of Dr. Serushan, or how it was, or was not, inconsistent with plaintiff's allegations. The Commissioner disagrees, claiming that the ALJ thoroughly discussed the doctor's opinion and weighed it against the other

---

[146] *O'Connor-Spinner*, 627 F.3d at 620.
[147] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

evidence in the record as a whole. The Commissioner asserts that the record supports the ALJ's

decision to accord Dr. Serushan's opinion little significance because of the state agency doctors'

reports and the evidence of plaintiff's daily activities.

According to SSR 96-2p, a treating source's medical opinion is given controlling weight only

when well supported by medically acceptable evidence. The ALJ suggests that Dr. Serushan's

opinion is not controlling because it relied so heavily on plaintiff's subjective allegations. This

proposition seems questionable because fibromyalgia's "causes are unknown, there is no cure, and,

of greatest importance to disability law, its symptoms are entirely subjective."[148] For a disease with

a diagnosis so subjective in nature, a patient's report of symptoms becomes far more influential.

There were also ample doctor's notes written by Dr. Serushan from prior years documenting the

myriad of allegations made by plaintiff, as well as documentation of plaintiff's many tender points.

Nonetheless, Dr. Serushan's report does contradict a significant portion of the record. The

ALJ explains that plaintiff's daily activities, such as recreational sewing and caring for a baby, are

inconsistent with her allegations of pain and "were not discussed by [Dr. Serushan] in the

questionnaire."[149] Similarly, the state agency doctors' reports directly contradicted those of Dr.

Serushan. Those doctors concluded that plaintiff was still capable of performing many daily

activities. And we know that a diagnosis of fibromyalgia in and of itself does not necessitate a

finding of disability because the Seventh Circuit has stated that while "[s]ome people may have such

a severe case of fibromyalgia as to be totally disabled from working . . . most do not."[150] Dr.

Serushan's notes relating to plaintiff's pain and tender points support his diagnosis of the disease,

---

[148] *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).
[149] R. at 30.
[150] *Id.* at 307 (citation omitted).

but not necessarily his assertion of disability.

Once the ALJ concluded that the opinion was not controlling, he was required to weigh it using the factors in 20 C.F.R. 404.1527 (c)-(e). These factors include whether the physician examined or treated the patient, how long the treatment relationship had existed, the nature and extent of that relationship, the medical signs and laboratory findings supporting the opinion, and the consistency of the overall record as a whole with the opinion. After considering Dr. Serushan's opinion, ALJ Fina granted it little weight.[151] Although he acknowledged that treating physicians like Dr. Serushan generally deserve more weight than non-treating state agency doctors, ALJ Fina justified his conclusion by citing to the evidence in the record of plaintiff's relatively extensive daily activities.[152] The ALJ determined that this evidence significantly outweighed Dr. Serushan's treating relationship with plaintiff and plaintiff's subjective complaints of pain, which Dr. Serushan relied on heavily.[153]

However, plaintiff also argues that if the ALJ, in part, rejected Dr. Serushan's opinion because he felt that it needed further explanation, he was required to recontact the doctor for clarification.[154] Plaintiff asserts that the Seventh Circuit has held similarly, stating that "[a]n ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible."[155] Yet the medical support in this case was, in fact, readily discernible. As plaintiff acknowledges, fibromyalgia is difficult to diagnose objectively and doctors must rely heavily on the subjective reports of their patients. However, the ALJ rightfully pointed out that Dr.

---

[151] R. at 30.
[152] *Id.*
[153] *Id.*
[154] SSR 96-5p at *2 (Westlaw).
[155] *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2009).

Serushan failed to address the bulk of evidence relating to plaintiff's daily activities that suggest that she is not disabled. As the Commissioner argues, the ALJ found that the basis for Dr. Serushan's claim was insufficient, not unclear. And the Seventh Circuit has held that "[a]n ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."[156] Here, there is nothing to suggest that the ALJ had inadequate evidence to make a disability determination.

## C. The ALJ's Credibility Determination

Plaintiff further argues that the ALJ erred because he did not explain how he considered all available evidence, particularly that of plaintiff's complaints of pain, when making his credibility determination. The Commissioner responds that pain or a diagnosis of fibromyalgia do not automatically lead to a finding of disability. The Commissioner then refers to the standard of review on credibility, which requires us to give even more deference to the ALJ. We are only to overturn a credibility analysis when it is "patently wrong."[157] This strict standard applies because the individuals present at the actual hearing are thought to be in the best position to make judgments as to credibility.[158] As long as the ALJ has properly articulated his or her reasoning, then the decision will not be disturbed.

Applying this standard here, the ALJ's credibility assessment was not patently wrong. He documented a wide variety of evidence in his analysis, including facts both favorable and unfavorable to the credibility of the plaintiff. And, as discussed above, pain also does not automatically equate with disability but, rather, is weighed against all evidence in the record. The

---

[156] *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

[157] *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (*quoting Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

[158] *Id.*

ALJ found "that while the claimant undoubtedly may experience some pain, limitations, and restrictions from her impairments, the medical record in its entirety demonstrates that the claimant has no greater limitations in her ability to perform work activities than those reflected in the residual functional capacity reached in this decision."[159] The ALJ weighed the evidence of plaintiff's reports of pain against the rest of the medical record. The ALJ relied on plaintiff's testimony at the hearing that she performed a variety of household duties, including serving as the primary caretaker at times for her granddaughter.[160] The ALJ also noted that she has, at times after her diagnosis, enjoyed sewing, making baskets, and making jewelry.[161] The ALJ emphasized these daily activities, as well as the opinions of all of the medical experts, before concluding that plaintiff was not entirely credible as to her "subjective complaints."[162]

Additionally, plaintiff argues that the ALJ put forth a circular argument by limiting what he found credible to that consistent with his RFC determination. But the Commissioner rightly states that the reasoning was not circular simply because the ALJ prefaced his argument with a summary paragraph. ALJ Fina analyzed the record as a whole in making his credibility decision, which then colored his RFC determination. Therefore, the Court rejects plaintiff's claim that the ALJ erred in his credibility determination.

**D. The ALJ's Determination of Plaintiff's Hand Limitations**

Though issues relating to plaintiff's ability to use her hands arguably falls within the ALJ's credibility assessment, we will briefly address it as a separate and final issue. Plaintiff alleges that the ALJ's RFC finding failed to account for her hand limitations. According to SSR 96-8P, an ALJ

---

[159] R. at 30.
[160] R. at 43, 48-50.
[161] R. at 45.
[162] R. at 30.

must base an RFC assessment on all relevant evidence of the record.[163] In the explanation of his RFC finding, ALJ Fina discussed plaintiff's allegations of right hand pain and resulting difficulty in pushing/pulling, opening jars, and turning pages with that hand.[164] He also documented her difficulty in signing her name because of the pain.[165] But the ALJ weighed these limitations, along with every other, against the evidence in the record as a whole and declined to find disability.

Plaintiff further states that the ALJ did not have a medical basis for his determination that plaintiff was capable of both gross and fine manipulation with her hands. However, Dr. Travis noted that plaintiff had demonstrated an ability to perform fine and gross manipulation.[166] Similarly, although not explicitly referenced by the ALJ, plaintiff's own treating physician, Dr. Serushan, did not check the box corresponding to pain in plaintiff's hands in his Fibromyalgia RFC Questionnaire, despite checking the box for almost every other body part.[167] Finally, there was nothing to suggest that plaintiff would not be able to use at least her left hand for the duties of a cashier and the ALJ noted that "[t]he claimant is . . .able to use her left hand as an alternative."[168] Accordingly, the Court rejects plaintiff's claim that the ALJ erred with respect to plaintiff's hand pain in his RFC assessment.

## V. CONCLUSION

For the reasons set forth above, the Court finds that the ALJ erred in his March 3, 2009 decision with respect to his failure to present a proper hypothetical and RFC assessment relating to plaintiff's limitations in concentration, persistence, or pace. Accordingly, the Court grants plaintiff's

---

[163] SSR 96-8P at *5 (Westlaw).
[164] R. at 27.
[165] R. at 145.
[166] R. at 322.
[167] R. at 324.
[168] R. at 27.

motion for summary judgment and remands this case for proceedings consistent with this opinion

[dkt 16.].

**IT IS SO ORDERED.**


                                                          U.S. Magistrate Judge
                                                            Susan E. Cox

Date: July 23, 2012